The Honorable Judge Ricardo S. Martinez

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

UNITED STATES OF AMERICA,

        Plaintiff

v.

ROBERT VAN CAMP,

        Defendant.

NO. CR22-072-RSM

GOVERNMENT'S SENTENCING
MEMORANDUM

12

13

14

15

16

17

18

19

    "…[S]o until I get caught and go to jail, fuck it, I'm taking the money, (laughs)!  I don't care."  These are the words of defendant Robert Van Camp.  He made this statement when bragging about his scheme to produce and sell fake COVID-19 vaccination record cards.  Van Camp's scheme was indeed successful: he printed fake COVID-19 vaccination cards that looked identical to legitimate ones; he wrote all the required vaccination information on each fake card; he sold and shipped fake cards to hundreds of unvaccinated individuals around the country; and he made at least $100,000 from his scheme in just 12 months.  Van Camp's scheme achieved another objective: he undermined the federal government's COVID-19 vaccination program, which he

20

21

22

23

24

25

26

27

United States' Sentencing Memorandum - 1
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

fervently opposed, by providing hundreds of people with a forged document they could use to circumvent lawfully imposed vaccination requirements.

Van Camp is before the Court for sentencing following his guilty plea to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371.  For the reasons stated below, the United States respectfully requests the Court to sentence Van Camp to a 15-month term of imprisonment, which is at the midpoint of the applicable sentencing guideline range, followed by a three-year term of supervised release.  The United States also requests that the Court impose a $100,000 fine, with $26,000 due immediately.

## I.     OFFENSE CONDUCT

**A.     Background on the Federal COVID-19 Vaccination Program**

In early 2020, the COVID-19 virus spread rapidly across our country.  To respond to this national public emergency, in May 2020, the federal government initiated Operation Warp Speed to make safe and effective COVID-19 vaccines available as quickly as possible to every American adult.  Seven months later, in December 2020, the first COVID-19 vaccine was administered and, by September 2021, the federal government had acquired over 673 million doses of the vaccines, which was sufficient to fully vaccinate every American adult free of charge.

To ensure the rapid and safe dissemination of the vaccines, the Centers for Disease Control and Prevention (CDC) controlled the distribution of COVID-19 vaccines and COVID-19 vaccination record cards, distributing them only to medical providers that entered into provider agreements with the CDC.  *See* PSR at ¶ 8.  Pursuant to these agreements, the administers of COVID-19 vaccines were required to provide a completed COVID-19 vaccination record card to every COVID-19 vaccine recipient.

COVID-19 vaccination record cards were designed and printed according to CDC specifications and contained both the United States Department of Health and Human

United States' Sentencing Memorandum - 2
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

1   Services' (HHS) and CDC's official agency logos.  COVID-19 vaccination record cards

2   recorded the name and date of birth of the individual receiving the vaccine, the name of

3   the manufacturer of the vaccines administered, the location where each dose was

4   administered, and the lot number of the vaccine dose.  A lot number is a unique number

5   given by vaccine manufacturers to a specific batch of a vaccine.  The CDC mandated that

6   valid proof of a COVID-19 vaccination—specifically, the COVID-19 vaccination record

7   card—could only be provided to vaccine recipients by providers authorized by the CDC

8   to administer COVID-19 vaccines.  Through this requirement, the CDC sought to ensure

9   that the COVID-19 vaccination record cards distributed to vaccine recipients contained

10  accurate and complete information.

11      During the COVID-19 public health emergency, proof of vaccination was required

12  by certain employers, including the federal government and numerous states, and by

13  certain hospitals, airlines, courts, universities, large venues, such as arenas, and by some

14  restaurants, bars, and gyms, among many other businesses and locales.  In many

15  instances, the entities requiring proof of vaccination for employment or entry insisted that

16  individuals provide a CDC COVID-19 vaccination record card in their name (or a

17  photograph of the same), along with a government-issued identification document, to

18  prove that they had been fully vaccinated.

19  **B.      Van Camp Created Hundreds of Fake CDC Vaccination Record Cards**

20      In April 2021, Van Camp obtained an electronic image of a blank COVID-19

21  vaccination record card that appeared visually identical to the official COVID-19

22  vaccination record cards designed and distributed by the CDC.  PSR at ¶ 16.  Van Camp

23  provided the electronic image to co-conspirator Kimberly Gabel, the owner of a UPS

24  Store in Parker, Colorado.  *Id.*  Van Camp instructed Gabel to print fake COVID-19

25  vaccination record cards to make them appear visually indistinguishable from legitimate

26  CDC COVID-19 vaccination record cards, including by printing them in the same size

27

United States' Sentencing Memorandum - 3
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

and by using similar paper and ink, as the official cards, and by printing them with HHS' and the CDC's official government logos. *Id.* at ¶ 17. Between April 2021 through at least January 2022, Van Camp instructed Gabel to print hundreds of fake vaccination cards. *Id.* at ¶ 18. Van Camp did so even though he is not a medical provider and was not authorized by the CDC to print or distribute COVID-19 vaccination record cards. *Id.* at ¶ 15.

Van Camp took great pride from the fact that his fake COVID-19 vaccination records looked identical to legitimate cards. For example, when selling his fake vaccination cards to an undercover agent, Van Camp said,

> I kind of have a hookup on the real, real 'V' card, you know what I'm saying? Like I can hook you and all of your employees up so if anybody asks you can show them the card. I've done it for about 700 of my customers.

*Id.* at ¶ 11. Likewise, Van Camp told another undercover agent that his cards were the "real deal" because they were made with the correct paper, ink, logos, and lot numbers. *Id.* at ¶ 13. Bragging to the same undercover agent, Van Camp stated,

> My cards are fucking beautiful. Now they are not fake. They're the exact perfect card. It's not even really a fake or copy – it's the card. It's just you didn't go to a hospital to get it, you got it from me. But it is the card.

Complaint, Dkt. 1 at ¶ 31.

**C.     Van Camp Filled Out His Fake Vaccination Record Cards Completely Before Distributing Them to Buyers**

Not only did Van Camp create fake COVID-19 vaccination record cards that looked identical to the cards distributed by the CDC, but he also completely filled out his fake cards before distributing them to their intended recipients, including writing real names and dates of birth on the cards, along with inserting false information concerning vaccination dates, vaccination providers, vaccination sites, vaccination manufacturers, and vaccination lot numbers. PSR at ¶ 19. To accomplish this, Van Camp directed his

United States' Sentencing Memorandum - 4
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

buyers and distributors to provide him with full names and dates of birth. *Id.* Van Camp further directed his buyers and distributors to provide location information or the name of a nearby pharmacy administering COVID-19 vaccines, so that Van Camp could write the name and store number of an actual authorized and local vaccine provider on each card. See *id.* Moreover, Van Camp asked buyers for the vaccination dates they wanted him to write on the cards so that a buyer could, for example, backdate their purported vaccination dates to get on an upcoming flight or attend an imminent event requiring proof of vaccination. In effect, instead of selling and distributing blank fake vaccination record cards, Van Camp took great pains to customize each card for its intended recipient to falsely make it appear that he or she had received both doses of an approved COVID-19 vaccine from an authorized medical provider.

**D.    Van Camp Sold and Distributed His Fake Vaccination Record Cards to More Than 2,000 Individuals**

Van Camp described his scheme to create, fill out, and distribute his fake COVID-19 vaccination record cards as a full-time job. Dkt. 1 at ¶ 32. Amid a national public health emergency, Van Camp was proud that he was providing hundreds of unvaccinated individuals with a forged document that they could use to deceive others into believing they were vaccinated and circumvent vaccination requirements. Van Camp made this clear when he told an undercover agent the following:

> I've got people that are going to the Olympics in Tokyo, three Olympians and their coach in Tokyo, Amsterdam, Hawaii, Costa Rica, Honduras. I've got a company, a veterinary company, has 30 people going to Canada every fucking day, Canada back. Mexico is big. And like I said, I'm in 12 or 13 states, so until I get caught and go to jail, fuck it, I'm taking the money, (laughs)! I don't care.

PSR at ¶ 12.

Van Camp supplied fully filled-out, fake COVID-19 vaccination record cards to more than 2,000 individuals in more than dozen states. *Id.* at ¶¶ 18, 20. In addition to

United States' Sentencing Memorandum - 5
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

selling his fake cards to individual buyers, Van Camp sold them to distributors who he knew were reselling the cards to other individuals.  *See id.* at ¶ 19.  Van Camp's buyers included individuals he knew were subject to the federal employee vaccination mandate, individuals he knew wanted to circumvent airline and other travel-related vaccination requirements, and individuals he knew wanted to evade school-imposed vaccination rules.  *Id.* at ¶¶ 9, 12, 20.

**E.      Van Camp Was Motivated by Greed and Hostility to the Federal Government's Vaccination Program**

Van Camp was not kidding when he told an undercover agent that "until I get caught and go to jail, fuck it, I'm taking the money, (laughs)!"  *See id.* at ¶ 12.  Defendant pocketed at least $100,000 from selling his fake COVID-19 vaccination record cards.  *Id.* at ¶ 20.  Additionally, when Van Camp increased his sales price, which eventually reached more than $150 per card, Van Camp told buyers that he had to charge more because the card stock he used to create the cards had increased in price.  *See id.* at ¶ 10. But that was <u>not</u> true.  Van Camp purchased the cards from Gabel at the same low rate for ink and paper costs throughout the entirety of the scheme.  *See id.*  Van Camp instead lied to his buyers about increased costs out of sheer greed, as he admitted when interviewed by law enforcement:

AGENT WERTSCH: So, you told some of your clients that the card stock costs money and that if you – made - screwed up a card it would cost you additional money…

VAN CAMP: Right.

AGENT WERTSCH: …you have to, you know, pay more and all this…

VAN CAMP: That was all just, you know, because I was trying to make money.

AGENT WERTSCH: Okay, so profit?

VAN CAMP: Yeah.  All on me.

United States' Sentencing Memorandum - 6
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

AGENT WERTSCH: So, she – so your friend, Kim [Gabel], was giving away the cards and all that and you were just making all the money.

VAN CAMP: Correct.  A hundred percent. She never charged me one dollar. That's God's truth.  Not one.

Interview Transcript, VanCamp_3433.

What's more, Van Camp's greed did not end after he was arrested in April 2022. When Van Camp was arrested, law enforcement seized a backpack from Van Camp containing more than $26,000 in cash.  The backpack also contained a firearm and ammunition.  *See* PSR at 3, n.2.  Van Camp admitted that the cash in the backpack was proceeds from his sales of fake vaccination record cards, as reflected in the following exchange:

AGENT PACHECO: As you probably know, they found some cash upstairs.

VAN CAMP: Mm-hmm.

AGENT PACHECO: That was in your backpack…

VAN CAMP: Correct.

AGENT PACHECO: … with your weapon.

VAN CAMP: Right.

AGENT PACHECO: What is that cash from?

VAN CAMP: That's – That's from the cards.

AGENT PACHECO: It is?  Okay.  All of it?

VAN CAMP: Yeah.

Interview Transcript, VanCamp_3423.  Law enforcement accordingly seized the cash.

However, approximately two months later, in June 2022, Van Camp submitted a claim to have the more than $26,000 returned to him.  *See* Ex. A, CBP Asset Claim Form; Ex. B, Letter from Van Camp to CBP Dated October 10, 2022.  Because the government does not have forfeiture authority pursuant to 18 U.S.C. § 371, the government returned $26,286 in proceeds to Van Camp in October 2022.  *See* Ex. C,

United States' Sentencing Memorandum - 7
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

CBP Refund Record.

More disturbingly, Van Camp's conduct was motivated by his opposition to the federal government's response to the COVID-19 pandemic and his desire to impede the CDC's vaccination efforts. *See* PSR at ¶¶ 13-14; Plea Agreement, Dkt. 46 at 8. Van Camp's statements to undercover agents—which included references to violence—make clear that he wanted to fight against the federal government's vaccination program. For instance, Van Camp stated that,

> I'm not making cards cause I'm bored, I'm making cards cause I'm in the middle of a fucking war and I, and I have a lot of guns and ammo, like an arsenal, and I'm trying not to kill anybody, so I'm, I'm exhausting myself doing cards, that I'm too tired to kill people, but people need to go, like this is some evil, it literally is good versus evil, this is bad. When the Congress and Post Office don't have to take it, but we, the sheeple, have to, come on man. It's red flag after red flag and these sheep don't see. I don't even get it…I love to fight, I want to fight.

PSR at ¶ 14. Similarly, when asked about the vaccine lot numbers that he was using on his fake vaccination record cards, Van Camp referenced violence again, stating, "[i]f there comes a point where they're figuring out how to manage lot numbers and databases, we're all screwed, it's time . . . I've got guns and ammo ready to go for that day." *Id.* at ¶ 13.

## II.    PROCEDURAL HISTORY

On April 18, 2022, Van Camp was charged by criminal complaint with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320(a)(1). Dkt. 1. On April 19, 2022, agents arrested Van Camp in the District of Colorado, where he was living at the time. Dkt. 5. On May 10, 2022, Van Camp made his initial appearance in the Western District of Washington. Dkt. 14.

On May 19, 2022, the Grand Jury returned a two-count indictment charging Van Camp with the same offenses named in the criminal complaint. Dkt 17. On May 26,

United States' Sentencing Memorandum - 8
*United States v. Van Camp*, CR22-072-RSM

1  2022, Van Camp appeared for his arraignment.  Dkt. 21.

2       On February 17, 2023, Van Camp pleaded guilty to conspiracy to defraud the

3  United States (Count 1) pursuant to a plea agreement.  Dkt. 46-47.

4                    **III.    SENTENCING GUIDELINES**

5       The United States agrees with the Probation Office on the sentencing guidelines

6  calculations, which are consistent with what the parties agreed to in the plea agreement.

7  The following guidelines calculation applies for Count 1 (conspiracy to defraud the

8  United States):

9

|                      | Guideline      | Adjustment |
|----------------------|----------------|------------|
| Base Offense         | 2B1.1(a)(2)    | 6          |
| Gain > $95,000       | 2B1.1(b)(1)(E) | 8          |
| Aggravating Role     | 3B1.1(c)       | 2          |
| Acceptance           | 3E1.1          | (3)        |
| **Total Offense Level** |             | **13**     |

16  PSR at ¶¶ 24-34.

17       The defendant's criminal history category  is I.  *Id.* at ¶¶ 35-41.  The resulting

18  guidelines imprisonment range is 12 to 18 months.  *Id.* at ¶ 70.

19                **IV.    SENTENCING RECOMMENDATION**

20       The United States recommends that the Court impose a 15-month term of

21  imprisonment, three years of supervised release, and a $100,000 fine.  This

22  recommendation is appropriate given "the nature and circumstances of the offense," and

23  the need for the sentence "to reflect the seriousness of the offense, to promote respect for

24  the law, and to provide just punishment for the offense," to ensure adequate general

25  deterrence, and "to protect the public from further crimes of the defendant."  18 U.S.C.

26  §§ 3553(a)(1), (a)(2)(A), and (a)(2)(C).

27

United States' Sentencing Memorandum - 9
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

A.       The Nature and Circumstances of the Offenses

Van Camp's offense is aggravated by at least five factors.  First, during the worst public health crisis in a century, in which more than a million Americans died as a result of a highly contagious virus, Van Camp's actions made it more likely that individuals would contract COVID-19 and suffer from the serious health conditions caused by COVID-19, including death.  While it is not possible to quantify the consequences of his conduct, by distributing fake, completely filled-out vaccination record cards on such a large scale and across such a wide area, Van Camp provided more than 2,000 unvaccinated individuals an entry ticket to places where, because of public health determinations, only vaccinated persons were supposed to enter.  Van Camp knew—and indeed was proud—that his fake vaccination cards, each containing his own handwritten false vaccination information, were being used by unvaccinated individuals to access workplaces, hospitals, schools, airplanes, foreign countries, and many other places that required vaccination.  As the Probation Office aptly stated, "[a]t the very least, Mr. Van Camp undermined others' ability to make informed decisions about who they were exposed to during the pandemic.  Mr. Van Camp supplanted their right to choose with his own, and this decision may have had grave health effects unknown to the parties." Probation Sent. Rec. at 3.

Second, the fact that Van Camp is still unwilling to even acknowledge that his conduct demonstrated clear recklessness and serious disregard for the health and safety others speaks volumes.  *See, e.g.,* Dkt. 53 at 7 ("the harm resulting from Mr. Van Camp's crime should be limited to how the fake vaccination cards skewed the statistics that keep track of who is, and who is not, vaccinated"); Dkt. 53-8 at 3 ("these cards did not threaten public health").  Van Camp, instead, attempts to excuse his conduct on the notion that the pandemic "divided our country into two camps—those who supported the vaccine programs and those who felt anxious about these vaccines and their possible side effects

or possible death." Dkt. 53-8 at 1.  He states that he now knows what he did was "wrong in the eyes of the law" but he continues to try to justify his conduct based on his subjective belief that vaccines are harmful, his belief in "My Body My Choice," and his purported need to go "into protection mode to help [his] family and friends during a time of crisis." *Id.* at 2-4.  These overwrought statements—along with most of what Van Camp states in his letter to the Court—show that he still does not get it.

The fact of the matter is that, based on serious public health considerations, the federal government, state governments, private businesses, and other entities, implemented certain requirements, including vaccination requirements, to protect the health and safety of individuals.  Van Camp, like every other citizen, had the right to lawfully oppose those requirements.  But that is <u>not</u> what he chose to do.  He instead chose to deliberately undermine and impede the federal government's response to the pandemic and chose to help hundreds of individuals evade requirements that lawful authorities implemented because they determined they were necessary to stem the tide of a deadly pandemic.  Van Camp's subjective beliefs and personal views in no way excuse or mitigate his actions.  Disagreement with a lawful requirement does not justify violating it.

Third, despite all his attempts to justify his behavior, it is telling that Van Camp does not address his comments about responding violently to vaccination efforts.  As noted above, Van Camp stated, "I'm not making cards cause I'm bored, I'm making cards cause I'm in the middle of a fucking war and I, and I have a lot of guns and ammo, like an arsenal, and I'm trying not to kill anybody, so I'm, I'm exhausting myself doing cards, that I'm too tired to kill people, but people need to go." PSR at ¶ 14.  This is a frightening and troubling statement that reveals the type of mindset that drove Van Camp's behavior.  Taken together with his other comment about having "guns and ammo ready," and with the fact that he possessed a gun when arrested, these statements raise

United States' Sentencing Memorandum - 11
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

1   real concerns about how far Van Camp was willing in his fight against the federal

2   vaccination program.

3       Fourth, Van Camp's adamance that he was not motivated by greed is plainly

4   belied by the evidence.  Dkt. 53 at 1.  In his letter to the Court, Van Camp states that he

5   did not "make a bunch of money off people" and that "[m]ost of these cards were made

6   for free and given to people[.]"  Dkt. 53-8 at 7.  That is not true.  As an initial matter, Van

7   Camp admitted in his plea agreement that he made at least $100,000 in twelve months

8   from selling fake vaccination cards.  Dkt. 46 at 8.  He also stated the same to law

9   enforcement:

10      AGENT PACHECO: So, you deposited you said approximately a hundred

11  thousand dollars…

12      VAN CAMP: Oh no.  There's no way I just – I don't think so.

13      AGENT PACHECO: Oh, okay, I thought that's what you guys said.

14      VAN CAMP: No, I said I probably made a hundred thousand dollars, total.

15      AGENT PACHECO: Oh, made a hundred thousand. Okay, okay.

16      VAN CAMP: Yeah, yeah.

17  Interview Transcript, VanCamp_3477.

18      Van Camp further made clear that he was motivated by profit:

19      AGENT WERTSCH: But you're also making a good amount of money off this.

20  This wasn't pure…

21      VAN CAMP: Mm-hmm, I mean, yeah, I'm a businessman.

22      AGENT WERTSCH: …goodness out of your own heart… this is a business,

23  right?

24      VAN CAMP: Yeah, I'm a businessman.  I've been an entrepreneur my whole life,

25  yeah.

26          . . .

27

United States' Sentencing Memorandum - 12
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

1    AGENT WERTSCH: Right, but you could've just given the cards away if it was

2  truly just because you were worried about families losing jobs, right?

3    VAN CAMP: You're right, yeah.  Yeah, I did profit from it.

4    AGENT WERTSCH: So, it wasn't just – wasn't just altruism here, there was a

5  profit motive behind what you were doing.

6    VAN CAMP: Yeah, there was both, yeah.

7  Interview Transcript, VanCamp_3418-19.

8    Moreover, as discussed above, Van Camp admitted that the more than $26,000 in

9  cash found in his backpack were proceeds from his fake card sales.  Additionally, Van

10  Camp admitted that when he raised his prices for his fake cards, he falsely told his buyers

11  that his own costs had increased so that he could make more money.  In short, numerous

12  prior statements by Van Camp are at direct odds with his new claim that "it was not about

13  the money."  Dkt. 53-8 at 7.  As the Probation Office correctly noted, Van Camp "saw an

14  opportunity to make money and directed a fraud scheme to that end."  Probation Sent.

15  Rec. at 3.

16    Fifth, Van Camp's sentence should account for the scale of his scheme.  It is

17  undisputed that Van Camp distributed fake vaccination record cards to more than 2,000

18  individuals across more than a dozen states during a twelve-month period.  PSR at ¶¶ 18,

19  20.  Accordingly, his offense was by no means a momentary lapse of judgment, but rather

20  a determined ongoing effort that only stopped because of his arrest.  Indeed, Van Camp

21  was told at the very beginning of his scheme that he should not sell fake vaccination

22  cards but he paid no heed.  PSR at ¶ 10.  Van Camp tries to minimize the full scope of his

23  illegal activity, suggesting that he only made cards for "those in his orbit" and "for those

24  around [him]."  See Dkt. 53 at 4; Dkt. 53-8 at 4.  That is not accurate.

25    Rather, the evidence in this case, including extensive communications between

26  Van Camp and buyers, overwhelming shows that he sold cards to anyone who wanted

27

United States' Sentencing Memorandum - 13
*United States v. Van Camp*, CR22-072-RSM

them, regardless of whether he knew the buyers and regardless of how many cards they wanted, so long as they paid for them.  In fact, when the first undercover agent contacted Van Camp, it was Van Camp—not the agent—who brought up the subject of fake vaccination cards, with Van Camp asking, without any prompting, if the agent wanted to buy his cards for "$120 apiece."  VanCamp_3263.

**B.      Defendant's History and Characteristics**

While it is notable that Van Camp was convicted of armed bank robbery and served 51 months in federal custody approximately 30 years ago, since then he has lived a law-abiding and professionally successful life until the instant offense.  Unlike many other defendants in the criminal justice system, Van Camp has ample financial means. He reported to Probation that he and his wife currently rent a five-bedroom house while building a home where they plan to live upon its completion.  PSR at ¶ 52.  As another example of defendant's financial means, while not reported in the PSR, around the time that Van Camp was arrested in this case, he and his wife sold their residence in Colorado for approximately $1.9 million.  All told, Van Camp reported a total household net worth of nearly $2.4 million.  PSR at ¶ 68.

In addition to wealth, it is readily apparent from the letters of support that Van Camp has strong relationships with his family and many friends.  Considering his financial means and his community ties, it is concerning that Van Camp sought to exploit a national emergency for personal financial gain and did not heed the advice of community members who told him from the start that he should not be selling fake vaccination cards.  *See id*. at ¶ 10.

The letters of support may be heartfelt, but they are not unusual in cases involving privileged defendants, and therefore do not themselves merit a variance below the guideline range.  *See United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters are "by no means out of the ordinary" because privileged offenders

United States' Sentencing Memorandum - 14
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

"often have impressive records of civic and philanthropic achievement"); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's "record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence").  Van Camp's good deeds neither lessen the recklessness of his conduct nor erase his greedy actions, and in some ways they render his crime more reprehensible.  Additionally, as the Court considers the weight to place on the letters of support, it should be aware that approximately 20 of the letters were written by individuals who obtained fake vaccination cards from Van Camp.

The letter that matters the most here is the one written by Van Camp.  The government submits that Van Camp's letter to the Court reveals his true characteristics.  Although he admits to wrongdoing, Van Camp devotes most of his letter to trying to justify, excuse, or minimize his conduct.  According to Van Camp, his forgery of hundreds of official CDC vaccination cards was his attempt at "doing the right thing" and "just to help my friends." Dkt. 53-8 at 1-2.  And then, because people "were begging for [his] help" and because he was forced to make his own "Emergency Decisions," he "went into protection mode to help [his] family and friends during a time of crisis." *Id.* at 3-4.  Because "those around [him] desperately needed" fake vaccination cards it "was up to [him] to try to save all the lives of the thousands of people that came to [him] begging for a way out[.]" *Id.* at 4.  With his transformation from defendant to hero almost complete, Van Camp declares, "[e]ach person I made these cards for believes 100% that I saved their life, their career, their kids, their home mortgage etc." *Id*.  "Only time will tell," contends Van Camp, whether "medical journals in the future" will prove he was "right or wrong." *Id.*

Nowhere in his letter does Van Camp acknowledge the recklessness of his conduct—he instead dismisses vaccination restrictions as flawed science. *Id.* at 3. Nowhere in his letter does he address the $100,000 he admitted to pocketing from his

United States' Sentencing Memorandum - 15
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

scheme or the $26,000 in cash that he admitted came from card sales—instead he falsely claims that he did not "make a bunch of money" and compares himself to Robin Hood. *Id.* at 7.  Nowhere in his letter does he discuss his comments about taking up arms against the federal government—he instead equates his conduct to how "Blacks, Asians, Hispanics etc are fighting for more rights." *Id.* at 3.

As stated, Van Camp's letter reveals how he truly feels about his criminal conduct: he is not remorseful; he still believes his actions were justified; he thinks he knew better than everyone else; he believes history will vindicate him; and he is both the hero and the victim in this case.

**C.    A Significant Term of Imprisonment and a $100,000 Fine Are Just Punishment and Are Necessary to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Deter Similar Conduct**

A significant prison sentence is required to reflect the seriousness of Van Camp's offense and to provide just punishment.  As previously noted, despite his ample wealth and economic security, Van Camp took advantage of a national emergency for personal gain and purposefully enabled hundreds of individuals to elude lawfully imposed public health requirements.  Forgery of a federal document, especially for the purpose intended here, and on the scale accomplished by Van Camp, is a serious crime that merits a serious sentence.

Van Camp's case is one where a significant sentence also is needed to promote respect for the law.  Van Camp has made his disrespect for the law abundantly clear: "…so until I get caught and go to jail, fuck it, I'm taking the money, (laughs)!  I don't care."  PSR at ¶ 12.  Additionally, a significant sentence would send the message to the hundreds of individuals who purchased fake vaccination cards from Van Camp that they, too, must respect the law.

Although the national emergency has ended, it is still important that people, including the defendant, understand that there are serious repercussions for trying to

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

undermine the CDC and other lawful authorities as they respond to national crises.  The defendant and others need to be reminded that disagreement with a law does not entitle them to violate it or undermine the authority implementing that law.  If the consequences of Van Camp's actions do not result in a custodial sentence, then the deterrent effect on defendant and others will be greatly diminished.  As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for fraudsters in order to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business."  S. Rep. No. 98–225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.

Finally, because Van Camp has admitted that he made at least $100,000 from the sale of fake vaccination cards, it appropriate that he be fined $100,000.  A fine in any amount lower than $100,000 would allow Van Camp to profit from his crime and permit him to walk away with ill-gotten gains.  Furthermore, given that more than $26,000 of admitted criminal proceeds were returned to Van Camp in October 2022 upon his request, he should be required to pay $26,000 of his total fine immediately.

United States' Sentencing Memorandum - 17
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## V.    CONCLUSION

For the foregoing reasons, the Court should sentence Van Camp to 15 months'
imprisonment, to be followed by a three-year term of supervised release.  The Court
should also order Van Camp to pay a $100,000 fine, with $26,000 of that fine due
immediately.

Dated: August 11, 2023

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice


 s/ Christopher Wenger
CHRISTOPHER WENGER
S. BABU KAZA
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave, NW
Washington, DC 20005
Phone: 202-445-9670
Fax: 202-514-3708
Email: christopher.wenger@usdoj.gov

United States' Sentencing Memorandum - 18
*United States v. Van Camp*, CR22-072-RSM

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
1400 NEW YORK AVE., NW
WASHINGTON, DC 20005
(202) 445-9670